RAND METOYER, M.D.
v.
SLIDELL MEDICAL MANAGEMENT, L.L.C. AND SLIDELL SPECIALTY HOSPITAL, L.P.
CHRISTOPHER LEW, M.D.
v.
SLIDELL MEDICAL MANAGEMENT, L.L.C. AND SLIDELL SPECIALTY HOSPITAL, L.P.
No. 2008 CA 0794, Consolidated with No. 2008 CA 0795.
Court of Appeal of Louisiana, First Circuit.
October 31, 2008.
NOT DESIGNATED FOR PUBLICATION
STEPHEN D. MARX, Counsel for Plaintiffs/Appellants, Rand Metoyer, M.D., and Christopher Lew, M.D.
W. CHRISTOPHER BEARY R. RAY ORILL, JR., Counsel for Defendants/Appellees, Slidell Medical Management, L.L.C., and Slidell Specialty Hospital, L.P.
Before: CARTER, C.J., WHIPPLE and DOWNING, JJ.
WHIPPLE, J.
In this appeal arising from a partnership dispute, plaintiffs appeal the trial court's judgment: (1) ordering defendants to honor checks previously issued to plaintiffs, or to reissue checks to them if the original checks were no longer valid, representing the purchase price for their partnership interests in a limited partnership that developed a specialty hospital in St. Tammany Parish, thereby upholding defendants' termination of plaintiffs' partnership interests; and (2) awarding defendants attorney's fees based on plaintiffs' alleged breach of the partnership agreement. For the following reasons, we affirm in part, amend in part, and reverse in part.

FACTS AND PROCEDURAL HISTORY
In late summer or early fall of 2002, several physicians in St. Tammany Parish, including plaintiffs, Dr. Rand Metoyer and Dr. Christopher Lew, were presented with the opportunity to invest in the development of a specialty surgical hospital, ultimately called Southern Surgical Hospital ("the specialty hospital"). Slidell Specialty Hospital, Limited Partnership ("the limited partnership") was formed for the purpose of developing and operating the specialty hospital. Slidell Medical Management, L.L.C., was the general partner of the limited partnership, and Dynacq International, Inc., was the sole member of the general partner. At that time, Irvin Gregory was an employee of Dynacq, and Bay Ingram was a consultant for Dynacq. Gregory and Ingram were the individuals who spearheaded the business venture. The prospective physician investors were offered the opportunity to purchase limited partnership units in the limited partnership.
To this end, the prospective physician investors, including plaintiffs, received a Confidential Offering Memorandum, offering them the opportunity to purchase up to four limited partnership units each at a cost of $20,000.00 per unit. Attached to the Confidential Offering Memorandum were the Amended and Restated Limited Partnership Agreement and a twoyear financial forecast, which was based in part on projections made by the prospective physician investors as to how many procedures they anticipated performing at the specialty hospital and was prepared for the purpose of forecasting the financial feasibility of the project.
Ultimately, in December of 2002, Drs. Metoyer and Lew each signed a Subscription Agreement, and each purchased four limited partnership units, for a total price of $80,000.00 each. Even though Drs. Metoyer and Lew did not sign the Amended and Restated Limited Partnership Agreement at that time, pursuant to the terms of the Subscription Agreement, Drs. Metoyer and Lew agreed "to become a party to the Partnership Agreement and to be bound by all of its terms and conditions."
Over the next two years, steps were taken to move the project forward, but proposed federal legislation to place a moratorium on physician-owned specialty hospitals threatened the viability of the project. Through efforts of Bay Ingram, a representative of the general partner, the federal legislation that was passed excluded from the moratorium physician-owned specialty hospitals under development by November 18, 2003. 42 U.S.C. § 1395nn(d)(3)(B) & (h)(7)(B)(i)(II) (as amended by § 507 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, PL 108-173, 117 Stat 2066). Nonetheless, progress on the project was delayed while the limited partnership awaited a decision from the United States Department of Health and Human Services, Center for Medicare Management Services, as to whether this specific project was excluded from the moratorium under the federal legislation. Because obtaining a determination from the Center for Medicare & Medicaid Services that the specialty hospital was exempt from the federal physician-owned specialty hospital moratorium was a contingency listed in the purchase agreement for the real estate on which the hospital was to be constructed, there was a delay in the purchase of the real estate.
When the letter confirming that the specialty hospital was exempt from the federal moratorium was finally received on August 18, 2004, the general partner, the real estate developer and various physician limited partners were very anxious to move the project forward to the construction phase. At that point, the closing for the real estate was scheduled for August 31, 2004. Don McMath, the real estate developer and majority owner of Hospital Real Estate of St. Tammany, L.L.C., the purchaser of the land, was adamant that the real estate closing not be delayed any longer so that construction could begin. However, on August 23, 2004, Ingram was informed by Whitney National Bank, the bank loaning the funds for the transaction and handling the closing, that as a condition of the closing of the loan, Whitney required a fully executed limited partnership agreement.
Because the parties had never executed the Amended and Restated Limited Partnership Agreement attached to the Confidential Offering Memorandum, counsel for the limited partnership began to prepare an agreement for execution by all partners. The First Amended and Restated Limited Partnership Agreement was drafted at that time to incorporate certain amendments that had been previously agreed to by the parties in Cumulative Supplements Nos. 1 and 2.[1] Additionally, Dr. James Gosey and Dr. Simon Finger, two orthopedic surgeons who were physician limited partners, requested that the general partner meet with them and their attorney, Kathleen DeBruehl, to discuss other proposed amendments to the limited partnership agreement.
Thus, on August 24, 2004, a draft of the First Amended and Restated Limited Partnership Agreement was emailed to DeBruehl, and on August 25, 2004, a meeting was held with the general partner, through its counsel, Drs. Gosey and Finger, and DeBruehl.[2] As a result of that meeting, additional amendments to the limited partnership agreement were agreed upon by those participating in the meeting. However, prior to the meeting, neither Dr. Metoyer nor Dr. Lew was informed of, or invited to attend, the meeting.
Thereafter, on Friday, August 27, 2004, Ingram, as representative of the limited partnership and part owner of the general partner, delivered the First Amended and Restated Limited Partnership Agreement, with an accompanying cover letter, to all the physician limited partners for execution. In the cover letter, counsel for the general partner and the limited partnership advised that time was of the essence and that the First Amended and Restated Limited Partnership Agreement had to be signed and returned to counsel "no later than close of business, Monday, August 30, 2004," so that the real estate closing could proceed as scheduled on August 31, 2004.
However, during the preceding two-year period, tension had developed among some of the partners. Specifically, plaintiffs owned and operated a pre-existing pain management clinic, the Helios Outpatient Center, and some of the other physician limited partners questioned plaintiffs' commitment to the success of the specialty hospital, given plaintiffs' intentions to continue to operate the Helios facility. Also, Gregory and Ingram became concerned that plaintiffs were causing disruption and uncertainty and were attempting to convince the other physician limited partners to proceed with the project without the general partner, thereby eliminating their interests in the deal.
On the other hand, plaintiffs were concerned about whether their investment in the specialty hospital would somehow prevent them from continuing to operate the Helios Clinic, especially given that they had become aware that a meeting had taken place among DeBruehl, Drs. Gosey and Finger, and the general partner through its counsel, the meeting to which they were not invited and at which changes to the agreement were made. Thus, a level of distrust had developed between plaintiffs and the other partners.
With this breakdown in trust among the partners as a backdrop, plaintiffs refused to sign the First Amended and Restated Limited Partnership Agreement until they could have their attorney review it for them. However, plaintiffs' attorney was out of town that weekend and, thus, was not available to review the agreement until Wednesday, September 1, 2004.
Meanwhile, on Monday, August 30, 2004, when the limited partnership had not yet received the signed First Amended and Restated Limited Partnership Agreement from plaintiffs, the limited partnership, through its counsel, sent by facsimile a letter to plaintiffs, informing them that "[flailing to receive the executed Amended Partnership Agreement by 3:00 p.m. today will place all of the owners of Slidell Specialty Hospital, L.P. in a position of having no alternative but to vote your interests out of the partnership as owners and proceed with the transaction without you." When plaintiffs still did not sign the First Amended and Restated Limited Partnership Agreement, all remaining partners of the limited partnership voted to terminate plaintiffs' interests in the limited partnership, effective September 1, 2004.
Due to an unrelated title problem, the closing was actually postponed from August 31, 2004 to September 1, 2004. On the day of the closing, Dr. Lew appeared at the location of the closing and was given a letter from the general partner authorizing him to continue his operations of the Helios Outpatient Center, a letter that he first requested the day before. Upon receiving the letter "grandfathering in" the Helios Outpatient Center and stating that future operations of the clinic would not be considered a violation of the limited partnership agreement, Dr. Lew signed the First Amended and Restated Limited Partnership Agreement. All remaining partners then voted to reinstate Dr. Lew's interests in the limited partnership.
Dr. Metoyer never signed the First Amended and Restated Limited Partnership Agreement, and he was never readmitted into the limited partnership. The general partner tendered to Dr. Metoyer a check for $80,000.00, representing his original investment.
After signing the First Amended and Restated Limited Partnership Agreement, Dr. Lew remained a physician limited partner during the construction of the hospital building and even executed the Second Amended and Restated Limited Partnership Agreement. However, problems persisted, and subsequently by letter dated April 18, 2005, the limited partnership and the general partner, through their attorney, expressed dissatisfaction with Dr. Lew's alleged failure to fulfill his obligations under the partnership agreement. Specifically, the limited partnership and the general partner contended that Dr. Lew's failure to cooperate with the development of the billing system for the specialty hospital and failure to provide needed information was obstructing the business of the specialty hospital. In the letter, Dr. Lew was warned that such future actions would not be tolerated and could result in his removal from the limited partnership.
Thereafter, Dr. Lew's limited partnership interest was again terminated, effective July 13, 2005, on the alleged basis that he had disrupted the affairs of the limited partnership or had acted adversely to the best interest of the limited partnership. The general partner subsequently tendered a check to Dr. Lew in the amount of $80,000.00, representing his original investment in the limited partnership.
In response to the termination of his limited partnership interest, Dr. Metoyer filed suit against the limited partnership and the general partner, seeking a declaratory judgment reinstating him as owner of four limited partnership units and awarding monetary damages for the wrongful termination of his limited partnership interest. Dr. Lew also filed a petition for declaratory judgment and damages based on the alleged wrongful termination of his partnership interest. The suits were subsequently consolidated, and the matter proceeded to trial.
Following a bench trial, the trial court, in written reasons for judgment, found as a fact that both Dr. Metoyer's and Dr. Lew's partnership interests were terminated for good cause. The court further found that the return of plaintiffs' initial investments of $80,000.00 each was reasonable. Accordingly, the trial court rendered judgment ordering defendants to honor the checks previously issued to plaintiffs in the amount of $80,000.00 each, or, in the event the original checks were no longer valid, to reissue checks to plaintiffs in the amount of $80,000.00 each, thereby denying plaintiffs the relief sought in their petitions.[3] The judgment further awarded defendants legal fees and costs totaling $207,589.49.
From this judgment, plaintiffs appeal, contending that the trial court erred in: (1) failing to conclude that a material reason behind defendants' decision to expel plaintiffs was a violation of federal and state anti-kickback legislation; (2) failing to conclude that defendants had breached their contractual and legal obligations to plaintiffs by expelling them from the partnership; (3) requiring defendants to return to plaintiffs only the amount of their initial investments; and (4) awarding attorney's fees to defendants.

TERMINATION OF DR. METOYER'S PARTNERSHIP INTEREST (Assignments of Error Numbers 1 & 2)
Through these assignments of error, plaintiffs contend that the trial court erred in finding that the termination of Dr. Metoyer's partnership interest was reasonable or based on good cause. They contend that the trial court's finding is erroneous because termination of Dr. Metoyer's limited partnership interest for his failure to sign the limited partnership agreement was a violation of the contracts and because the decision was based, at least in part, on Dr. Metoyer's alleged refusal to refer all or more cases to the specialty hospital, an alleged violation of federal and state anti-kickback laws.
Pursuant to LSA-C.C. art. 2820, a partnership may expel a partner for just cause. Examples of conduct that constitute "just cause" for expulsion include failure to perform obligations, engaging in activities that would prejudice the business of the partnership, and willful or repeated breach of the partnership agreement. LSA-C.C. art. 2820, 1980 Revision Comments, comment (a).[4]
In the instant case, the trial court clearly found as a fact that Dr. Metoyer, through his actions, had failed to perform his obligations to the limited partnership and, thus, that his expulsion from the limited partnership was based on just cause. As an appellate court, we may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Henderson v Nissan Motor Corporation U.S.A., 2003-606 (La. 2/6/04), 869 So. 2d 62, 68. The manifest error standard demands great deference to the trier of fact's findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Great West Casualty Co. v. State Department of Transportation and Development, XXXX-XXXX (La. App. 1st Cir. 3/28/07), 960 So. 2d 973, 978, writ denied, XXXX-XXXX (La. 9/14/07), 963 So. 2d 1005.
The evidence presented at trial establishes that the specialty hospital project had been delayed for more than one year as a result of proposed federal legislation designed to place a moratorium on physician-owned specialty hospitals. Once the limited partnership obtained confirmation that this project was exempt from that moratorium, the contractor was anxious to start construction and was unwilling to delay the real estate closing any further. Thus, time was of the essence in regard to execution of the limited partnership agreement.
Dr. Metoyer testified that his concern in signing the First Amended and Restated Limited Partnership Agreement was whether the provisions of the agreement would somehow prevent him from continuing to operate his competing facility, the Helios Outpatient Center. However, when Dr. Metoyer signed the Subscription Agreement in December 2002, he agreed to be bound by the attached Amended and Restated Limited Partnership Agreement. That version of the limited partnership agreement contained a non-ownership clause, which prohibited the limited partners from holding an ownership interest in a competing business without prior written consent of the general partner.[5] Dr. Metoyer contended at trial that he discovered this clause some time after signing the Subscription Agreement, and he testified that the clause caused him some concern. Nonetheless, upon discovering the non-ownership clause in the Amended and Restated Limited Partnership Agreement, Dr. Metoyer did not at that time request that his attorney review the clause or advise him as to its implications with regard to the continued operations of the Helios Outpatient Center.
Additionally, Dr. Metoyer acknowledged that the non-ownership clause in the First Amended and Restated Limited Partnership Agreement, presented to him for his execution on August 27, 2004, was almost identical to the one found in the Amended Limited Partnership Agreement, to which he had previously agreed and which had been in his possession for approximately one and one-half years. Dr. Metoyer further acknowledged that, upon learning that his attorney was unavailable, Dr. Metoyer did not request that any other attorney in his attorney's firm review the First Amended and Restated Limited Partnership Agreement for him.
Moreover, there was conflicting testimony presented at trial as to whether Dr. Metoyer and Dr. Lew were in fact represented by DeBruehl and, thus, had the benefit of legal counsel reviewing the draft of the First Amended and Restated Limited Partnership Agreement on their behalf. Also, testimony was presented at trial suggesting other obstructionist behavior by Dr. Metoyer leading up to the termination of his limited partnership interest.
In support of plaintiffs' contention that termination of Dr. Metoyer's limited partnership interest for his failure to sign the limited partnership agreement was wrongful and violated the contracts between the parties, plaintiffs specifically rely upon section 2 of the Subscription Agreement signed by Dr. Metoyer when he purchased his four limited partnership units, which section provides:
Partnership Agreement. To induce the General Partner to accept this subscription, I hereby agree: (i) simultaneously with the acceptance of this subscription by the General Partner, to become a party to the Partnership Agreement and to be bound by all of its terms and conditions; and (ii) within ten (10) days after receipt of a written request from the Partnership, to provide such information and to execute and deliver such documents as the General Partner may deem to be necessary or desirable to comply with any and all laws and ordinances to which the Partnership is or may be subject.
Noting that a limited partnership agreement must be in writing and recorded with the Secretary of State, LSA-C.C. art. 2841, and that, without compliance with this law, Whitney Bank would not loan the construction funds, plaintiffs aver that Dr. Metoyer was entitled, pursuant to the terms of the Subscription Agreement, a ten-day period to execute and deliver the First Amended and Restated Limited Partnership Agreement to the general partner. Thus, plaintiffs contend, termination of Dr. Metoyer's limited partnership interest for his refusal to sign the document within three days of its receipt violated the terms of the parties' contracts, and, accordingly, the trial court committed manifest error in finding that the termination of Dr. Metoyer's limited partnership for his refusal to sign the document was based on good cause.
However, we note that in section 4 of the Subscription Agreement, which is more specifically addressed to execution of the limited partnership agreement, Dr. Metoyer warranted that he would "promptly execute and deliver to the General Partner a counterpart of the Partnership Agreement and any amendments thereto, in the form of the copy provided herewith, with such reasonable changes as the General Partner deems appropriate." (Emphasis added).
Under the specific facts herein, where the real estate closing for the property on which the specialty hospital was to be constructed hinged upon prompt execution of the limited partnership agreement and, consequently, where time was of the essence, we find no error in the trial court's decision to reject Dr. Metoyer's explanation for his failure to sign the limited partnership agreement. As the trial court correctly concluded, Dr. Metoyer's refusal to execute the First Amended and Restated Partnership Agreement, which contained an almost identical non-compete provision as the Amended Limited Partnership Agreement to which he had already agreed to be bound, clearly violated his obligation to "promptly" execute the partnership agreement. Thus, we find no manifest error in the trial court's factual finding that Dr. Metoyer had no intention to fulfill his obligations to the partnership and that his expulsion was for good cause.
Finding ample support for, and no manifest error in, the trial court's factual determination that Dr. Metoyer's actions indicated that he had no intention to fulfill his obligations to the partnership and, thus, that his partnership interest was terminated for just cause, we pretermit discussion of plaintiffs' contention that the trial court should have further concluded that the decision to terminate Dr. Metoyer's limited partnership interest was also based, at least in part, on Dr. Metoyer's alleged refusal to refer all or more cases to the specialty hospital, an alleged violation of federal and state anti-kickback laws.[6] Based on the foregoing and our review of the record as a whole, we find no manifest error in the trial court's determination that plaintiffs failed to establish that expulsion of Dr. Metoyer from the limited partnership was wrongful, arbitrary and capricious, or a breach of the fiduciary duties of either the limited partnership or the general partner. These arguments lack merit.

TERMINATION OF DR. LEW'S PARTNERSHIP INTEREST (Assignments of Error Numbers 1 & 2)
Plaintiffs further contend that the trial court erred in finding that the termination of Dr. Lew's limited partnership interest was based on just cause. Specifically, plaintiffs assert that expulsion of Dr. Lew for his alleged failure to provide information to the billing consultant constitutes unfair dealing between the parties, considering the size of his investment and the length of time he had been involved and actively participating in the specialty hospital project. Alternatively, they assert that if the real reason for Dr. Lew's expulsion was his refusal to consent to perform all or more of his procedures at the specialty hospital, then the decision to expel him was illegal and cannot be considered fair dealing.
The record on appeal establishes that subsequent to Dr. Lew's readmission into the limited partnership, the limited partnership continued to have problems with lack of cooperation from Dr. Lew. For example, once the specialty hospital was under construction, the limited partnership hired a billing consultant to assist it in setting up a billing system and insurance packages for the specialty hospital. The billing consultant requested that all the physician limited partners provide information to him regarding the billing codes they used and insurance companies with which they participated. However, evidence presented at trial indicated that Dr. Lew was very uncooperative and not forthcoming with the needed information. Specifically, Ingram testified that while all of the other physician limited partners had willingly provided all the necessary information, Dr. Lew was uncooperative in providing the information needed to plan the opening of the hospital.
Additionally, when the CFO of the specialty hospital requested Dr. Lew's social security number for a tax return, he received no response from Dr. Lew. Ingram testified at trial that he then personally called Dr. Lew and requested Dr. Lew's social security number for the tax return. According to Ingram, Dr. Lew indicated that he had included his social security number on his original Subscription Agreement and refused to supply it again. Even when Ingram explained to Dr. Lew that the Subscription Agreements were filed away and not easily accessible, Dr. Lew would not give his social security number to Ingram.
Thus, the limited partnership and general partner, by letter faxed to Dr. Lew on April 18, 2005, expressed concern to Dr. Lew about his refusal to cooperate with the billing consultant, particularly by providing him with only two billing codes and no other information requested. Thereafter, Dr. Lew's office faxed to the billing consultant a letter, dated February 14, 2005, but containing a fax confirmation date of April 20, 2005, containing some of the requested information. Notably, the letter mentions that the list of patient zip codes was "attached." However, the letter itself was page 2 of 2 of the fax transmittal, indicating that nothing was indeed attached to the letter in the fax transmittal.
On the other hand, Dr. Lew testified that the billing consultant had called him and asked for complete access into his office computer system, a request that Dr. Lew did not grant, given that he was in practice with Dr. Metoyer and Dr. Metoyer had been expelled from the limited partnership. Dr. Lew further testified that he directed the billing consultant to provide him with a written report of the information that was needed and that he would then provide the requested information. According to Dr. Lew, he never thereafter received a written request for the information.
Plaintiffs' office assistant, Joanna Metoyer, acknowledged that the billing consultant had requested billing codes, insurance information, and patient zip codes from her. However, Joanna Metoyer denied the truth of the assertions in the April 18, 2005 letter from the limited partnership and the general partner that Dr. Lew had provided only two billing codes and no other information. Rather, she contended that she had timely provided the information requested by letter dated February 14, 2005 (the letter that bears the fax confirmation date of April 20, 2005).
With regard to the request for his social security number, Dr. Lew testified that he did not recall Ingram or anyone else asking him to supply his social security number. Dr. Lew further contended that someone had asked his secretary for that information and that his secretary had not given him the message.
Considering the foregoing and the record as a whole, we note that the trial court was obviously faced with two conflicting views of the evidence and had to make credibility determinations in its ultimate factual findings. The record amply supports the finding that Dr. Lew's behavior following his readmission into the limited partnership was disruptive to the affairs of the limited partnership and that he had acted adversely to the best interests of the limited partnership. Thus, we cannot conclude that the trial court committed manifest error in finding as a fact that Dr. Lew's limited partnership interest was terminated for just cause. These arguments also lack merit.

VALUATION OF PLAINTIFFS' PARTNERSHIP INTERESTS (Assignment of Error Number 3)
In this assignment of error, plaintiffs contend that the trial court erred in finding that plaintiffs had been adequately compensated for their limited partnership interests. In reasons for judgment, the trial court found that plaintiffs should each receive a return of their initial $80,000.00 investment, the refund originally tendered to them by defendants, but refused by plaintiffs. This $80,000.00 award to each plaintiff represented a valuation of $20,000.00 for each limited partnership unit. Plaintiffs first contend that defendants failed to follow the procedure set forth in the limited partnership agreements for determining the value of their partnership interests. Additionally, they contend that the trial court was required to award them legal interest on the cash value of their partnership interest from the dates their respective memberships ceased.
A former partner is entitled to an amount equal to the value that his share had at the time membership ceased. LSA-C.C. art. 2823. With regard to payment for partnership interests, the Amended and Restated Limited Partnership Agreement, First Amended and Restated Limited Partnership Agreement, and the Second Amended and Restated Limited Partnership Agreement all provide as follows:
14.3 Payment for Partnership Interest.
* * *
(b) If the Partnership purchases any Limited Partner's interest in the Partnership as a result of an Adverse Terminating Event, the amount to be paid by the Partnership to such Partner shall be equal to the Valuation Price as of the day on which the sixty (60) day exercise period began to run, less any previous distributions to such Partner pursuant to Section 6.1 hereof.
(Emphasis added).
"Valuation Price" is defined in all three limited partnership agreements as the price per unit as determined by dividing the "Agreed Value" by the number of units issued and outstanding as of the end of the most recently completed fiscal quarter. However, in defining "Valuation Price," all three limited partnership agreements further provide that the "Valuation Price" shall be a minimum of $20,000.00 until the second anniversary of the opening of the hospital. All three limited partnership agreements use the same formula for determining "Agreed Value," which is a function of the average annual earnings of the partnership for the most recently completed eight fiscal quarters and the long-term debt of the limited partnership.
In the instant case, at the time of the termination of Dr. Metoyer's and Dr. Lew's partnership interests on September 1, 2004 and July 13, 2005, respectively, the specialty hospital had not been completed and, thus, had not opened for business. Accordingly, there was no evidence available or offered as to the average annual earnings of the limited partnership for the most recently completed eight fiscal quarters. Thus, the formula for "Agreed Value" was clearly inapplicable herein, and we find no error in the trial court's failure to apply that formula.
Nonetheless, pursuant to the terms of the partnership agreements, the "Valuation Price" for plaintiffs' partnership units was a minimum of $20,000.00, given that their limited partnership interests were terminated prior to the second anniversary of the opening of the specialty hospital. However, regarding plaintiffs' contention on appeal that the trial court erred failing to set a value higher than $20,000.00 per limited partnership unit, we note that plaintiffs presented no credible evidence as to a higher value of their limited partnership units as of the time of termination of their limited partnership interests.
Moreover, we find no merit to plaintiffs' argument that the trial court should have relied upon evidence of the value of limited partnership interests as of November 1, 2006, some two years and one month after Dr. Metoyer's September 1, 2004 expulsion, and one year and three and one-half months after Dr. Lew's July 13, 2005 expulsion. At the time of termination of plaintiffs' limited partnership interests, the specialty hospital was not operational and, as observed by the trial court, any increase in value from their initial investment at that time was "merely speculative." Any value that these limited partnership units may have had months or years after the termination of plaintiffs' limited partnership interests is of little significance to the value these units had prior to the specialty hospital even becoming operational. Thus, we find no merit to this argument.
Nonetheless, we do find merit to plaintiffs' contention that the trial court erred in failing to award them interest on the value of their limited partnership units. If a partnership continues to exist after one of the partner's membership ceases, the partnership must pay that partner the cash value of that partnership interest together with interest at the legal rate from the time membership ceases, unless otherwise agreed. LSA-C.C. art. 2824.
With regard to the issue of payment of interest, the limited partnership agreements herein only address the payment of interest where the purchase price is paid over time, providing for the payment of interest at the prime or base rate on any unpaid balance. In particular, the agreements provide that the purchase price can be paid in twenty-four monthly payments "with interest at the `prime' or base rate as established from time to time by JP Morgan Chase Bank, NA. (New York, New York branch) on the unpaid balance." However, with regard to the right to receive legal interest on the full value of the limited partnership units, as granted by LSA-C.C. art. 2824, the partnership agreements are silent as to any contrary agreement by the parties.
Because the limited partnership agreements at issue herein did not provide otherwise, plaintiffs were entitled to legal interest on the value of their limited partnership units from the time of termination of their limited partnership interests until payment was tendered to them by defendants. The judgment of the trial court will be amended accordingly to award plaintiffs interest at the legal rate on the value of their limited partnership interests from the dates that each of their memberships ceased until the dates that payment was tendered to them. See LSA-C.C. art. 2824.

AWARD OF ATTORNEY'S FEES (Assignment of Error Number 4)
In their final assignment of error, plaintiffs contend that the trial court erred in awarding defendants attorney's fees for defending this suit. With respect to Dr. Metoyer, plaintiffs correctly note that Dr. Metoyer never signed the First Amended and Restated Limited Partnership Agreement, the first version of the partnership agreement that actually contained an attorney's fee provision. Instead, the Amended and Restated Limited Partnership Agreement, the agreement to which Dr. Metoyer agreed to be bound, contained no attorney's fee provision. Thus, plaintiffs contend that defendants should not be entitled to recover attorney's fees under the same agreement that they expelled him for refusing to sign.
With regard to Dr. Lew, plaintiffs assert that the attorney's fee provision in the limited partnership agreements is inapplicable to and grants no right of recovery for a defense to the suit herein filed by Dr. Lew. Additionally, plaintiffs contend that while the Subscription Agreement signed by both of them does contain an attorney's fee provision, that provision is also inapplicable herein.
Defendants, on the other hand, contend that despite the fact that Dr. Metoyer did not sign the First Amended and Restated Limited Partnership Agreement prior to his expulsion, the partnership agreement was amended (by the First Amended and Restated Limited Partnership Agreement) prior to his expulsion, and he was therefore bound by the amended provisions. Thus, they contend, Dr. Metoyer is liable for attorney's fees pursuant to the terms of the First Amended and Restated Limited Partnership Agreement. They further contend that Dr. Lew is liable for attorney's fees pursuant to the terms of the Second Amended and Restated Limited Partnership Agreement.
Alternatively, defendants aver that both plaintiffs were liable for attorney's fees pursuant to the indemnification provision of the Subscription Agreement signed by plaintiffs.
Attorney's fees are not due and owing unless specifically provided for by contract or by statute. L & A Contracting Company, Inc. v. Ram Industrial Coatings, Inc., 99-0354 (La. App. 1st Cir. 6/23/00), 762 So. 2d 1223, 1236, writ denied, 2000-2232 (La. 11/13/00), 775 So. 2d 438. Thus, in reviewing the award of attorney's fees in favor of defendants, we look to the provisions of the limited partnership agreements and the Subscription Agreement.
Pretermitting consideration of whether Dr. Metoyer would even be bound by the provisions of the First Amended and Restated Limited Partnership Agreement, which he never signed, we nonetheless conclude that, even if the attorney's fee provision in the partnership agreement were applicable to him, defendants are not entitled to attorney's fees from either plaintiff under any of the agreements at issue.[7]
The attorney's fee provision in the First and Second Amended and Restated Limited Partnership Agreements provides as follows:
18.15 Attorneys Fees and Costs. In the event of a default by any party with regard to the obligations, warranties or covenants contained in this Agreement, the non-defaulting party shall be entitled to pursue all available legal remedies, including injunctive relief without the necessity of a bond, and the prevailing party shall be entitled to recover its reasonable attorney's fees and costs from the non-prevailing party in addition to any damages arising from such default.
(Emphasis added). In our view, the above provision clearing contemplates a situation where attorney's fees may be recoverable where the non-defaulting party pursued a legal remedy based on the other party's breach and prevailed in that legal proceeding. In the instant case, defendants, as the "non-defaulting party" in the above attorney's fee provision, did not seek to recoup attorney's fees incurred in their pursuit of a legal remedy brought by them against plaintiffs based on plaintiffs' alleged breach of the limited partnership agreements.[8] Rather, they seek to recoup attorney's fees incurred in defending the legal action brought by plaintiffs against them. Indeed, Ingram testified that defendants had filed a counterclaim against plaintiffs for attorney's fees incurred because defendants had had to hire counsel to defend this case brought by plaintiffs. The above provision is silent as to any right to recover attorney's fees incurred by the "nondefaulting party" in defending a suit or legal remedy brought by others. Cf. LHO New Orleans LM, L.P. v. MHI Leasco New Orleans, Inc., XXXX-XXXX (La. App. 4th Cir. 4/16/08), 983 So. 2d 217, 229-230, wherein the contract was more broadly worded to provide that if "either [party] retains an attorney to enforce the terms of or determine rights under this Agreement, the prevailing party shall be entitled to recover reasonable costs, attorney's fees and expenses." (Emphasis added). Thus, we conclude that the language of the attorney's fee provision in the First and Second Amended and Restated Limited Partnership Agreements does not encompass a right in favor of defendants, as "non-defaulting" parties, to recover attorney's fees in defending the suit against them.
With regard to defendants' argument that the attorney's fee award is nonetheless supported by the indemnity provision in the Subscription Agreements signed by plaintiffs, we likewise find no merit to that argument. At the outset, we note that the party seeking to enforce an indemnity agreement bears the burden of proof. McKinney v. South Central Bell Telephone Company, 590 So. 2d 1220, 1222 (La. App. 1st Cir. 1991), writ denied, 592 So. 2d 1302 (La. 1992). The indemnification provision found in the Subscription Agreements signed by plaintiffs provides as follows:
5. Indemnification. I hereby agree to indemnify and hold harmless the Partnership, and each Partner thereof (including both the General Partner and all Limited Partners), any corporation or entity affiliated with the Partnership or any Partner, their officers, directors and employees, or any of their professional advisors, from and against any and all loss, damage, liability or expense (including reasonable attorney's fees) due to or arising out of a breach of any of my representations or warranties contained in this Subscription Agreement.
(Emphasis added).
In the instant case, however, the attorney's fees incurred by defendants did not arise out of plaintiffs' breach of the Subscription Agreement. Rather, they were incurred by defendants in defending plaintiffs' suit against them based on defendants' alleged breach of fiduciary duties to plaintiffs and of the limited partnership agreement between the parties. Without commenting upon the amount awarded, considering the record and the proceedings conducted herein, we likewise conclude that the indemnification provision of the Subscription Agreement provides no legal basis for an award of attorney's fees in favor of defendants for its defense of this suit. Accordingly, the award of attorney's fees and costs in favor of defendants must be reversed.[9]

CONCLUSION
Based on the above and foregoing, the portion of the December 10, 2007 judgment ordering defendants to honor the checks issued to plaintiffs in the amount of $80,000.00 each, or, in the event the original checks are no longer valid, ordering defendants to reissue checks to plaintiffs in the amount of $80,000.00 each, is affirmed.
The judgment is amended in favor of Dr. Rand Metoyer and against the defendants, Slidell Medical Management, L.L.C. and Slidell Specialty Hospital, L.P., to award interest in favor of Dr. Rand Metoyer at the legal rate on the sum of $80,000.00 from September 1, 2004, the date of termination of his limited partnership interest, until October 26, 2004, the date upon which payment of $80,000.00 was tendered to Dr. Metoyer.
The judgment is further amended in favor Dr. Christopher Lew and against the defendants, Slidell Medical Management, L.L.C. and Slidell Specialty Hospital, L.P., to award interest in favor of Dr. Christopher Lew at the legal rate on the sum of $80,000.00 from July 13, 2005, the date of termination of his limited partnership interest, until August 15, 2005, the date upon which payment of $80,000.00 was tendered to Dr. Lew.
The portion of the judgment ordering plaintiffs to pay to defendants attorney's fees and costs in the amount of $207,598.49 is reversed.
Costs of this appeal are assessed one-half to plaintiffs Dr. Rand Metoyer and Dr. Christopher Lew and one-half to defendants Slidell Specialty Hospital, L.P., and Slidell Medical Management, L.L.C.
AFFIRMED IN PART, AMENDED IN PART, AND REVERSED IN PART.
NOTES
[1] The changes previously agreed to in Cumulative Supplement No. 2 included a change in ownership of the general partner. While Dynacq International, Inc., had initially been the sole member of Slidell Medical Management, L.L.C., the general partner, 100% of Dynacq's membership interests in the general partner were subsequently acquired by Health Group Partners, L.L.C., an entity in which both Gregory and Ingram had an ownership interest. Thus, at that point, Gregory and Ingram were not only representatives of the general partner, but also had ownership interests in the general partner.
[2] Kathleen DeBruehl was hired by Dr. James Gosey, one of the orthopedic surgeon physician limited partners, to represent at least some of the physician limited partners, namely the six orthopedic surgeons, and to assist them in analyzing this investment opportunity. However, the parties dispute whether DeBruehl also represented plaintiffs.
[3] Neither plaintiff had negotiated the $80,000.00 check issued to him from the general partner.
[4] The Amended and Restated Limited Partnership Agreement, to which plaintiffs agreed to be bound in their Subscription Agreements, provided that a limited partner's interest in the limited partnership could be terminated if an "adverse terminating event" occurred. In such a situation, the limited partnership had the right in the ensuing sixty days to purchase the limited partner's interest. An "adverse terminating event" was defined to include situations where the limited partner breached the terms and conditions of the limited partnership agreement or disrupted the affairs of the limited partnership.

Similarly, the First and Second Amended and Restated Limited Partnership Agreements provided that an "adverse terminating event" occurred when the limited partner breached the terms and conditions of the limited partnership agreement or when the limited partner disrupted the affairs of the limited partnership or had acted adversely to the best interest of the limited partnership.
Plaintiffs further assert that the termination of Dr. Metoyer was wrongful in that the Amended and Restated Partnership Agreement provided that the decision that an "adverse terminating event" had occurred was to be made by the advisory board and the general partner, which was not done herein. The record establishes that in fact an advisory board had not yet been created at the time of Dr. Metoyer's expulsion. However, we note that all the partners, with the exception of Drs. Lew and Metoyer, voted to terminate Dr. Metoyer's limited partnership interest. Thus, his interest was terminated upon a vote of the majority of the partners. See generally LSA-C.C. art. 2820.
[5] We note that the non-ownership provision further provided that a limited partner would not be in violation of this non-ownership provision if the limited partner held an ownership interest in a competing business on or before the date of the Confidential Offering Memorandum and the limited partner provided written notice thereof to the general partner prior to admission as a limited partner. Both Drs. Metoyer and Lew held their ownership interests in the Helios Outpatient Center prior to the date of the Confidential Offering Memorandum, and both had disclosed their interests in the Helios Outpatient Center to the general partner prior to their admission as limited partners.
[6] The Medicare Anti-Kickback Statute prohibits the solicitation or receipt of remuneration in return for referrals of Medicare patients and the offer or payment of remuneration to induce such referrals. 42 U.S.C. § 1320a-7b(b); United States ex rel Thompson v. Columbia/HCA Healthcare Corporation, 125 F.3d 899, 901 (5th Cir. 1997). The Statute makes it a felony to offer kickbacks or other payments in exchange for referring patients, but it does not create a private right of action for litigants. McNutt v. Haleyville Medical Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005); Donovan v. Rothman, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000).

The Anti-Kickback Statute features regulatory exceptions that remove certain contractual arrangements from its reach, such as investment interests. 42 C.F.R. § 1001.952(a). Plaintiffs contend, however, that the investment interests exception to the Anti-Kickback Statute does not apply herein because one of the applicable standards for the investment interests exception was not met. This standard for the investment interests exception, which plaintiffs contend was violated, provides that there must be "no requirement that a passive investor, if any, make referrals to, ... furnish items or services to, or otherwise generate business for the entity as a condition for remaining as an investor." (Emphasis added). Because we find ample factual support for the trial court's finding that plaintiffs' limited partnership interests were terminated for just cause, we pretermit discussion of whether plaintiffs would fall under this provision.
The state law at issue herein similarly provides that no healthcare provider shall offer, make, solicit, or receive payment for referring or soliciting patients. LSA-R.S. 37:1745(B). The statute further provides that [p]ayments representing a return on investment based upon a percentage of ownership are not considered a direct or indirect payment for purposes of this Section." Nonetheless, plaintiffs contend that this investment exception is also inapplicable herein because the administrative requirements implementing and interpreting this exception are not met herein. See LAC 46:4207(A). We note, however, that subsection (B) of LAC 46:4207 provides that any payment or remuneration that is not prohibited by 42 U.S.C. § 1320a-7b(B) shall not be deemed a payment prohibited by LSA-R.S. 37:1745(B).
[7] We also express our concern with the propriety of a representative of the general partner meeting with one group of limited partners and confecting a new agreement, then including in the partnership agreement an attorney's fee provision, which then, in turn, is used against a physician limited partner who was not invited to the meeting, who did not agree to that provision, and whose limited partnership interest was terminated almost immediately thereafter.
[8] Instead, the "legal remedy" defendants did pursue against plaintiffs was to expel them from the limited partnership by vote of the remaining partners. Clearly, the attorney's fees that defendants seek to recover herein were not incurred in pursuing that legal remedy.
[9] The trial court herein awarded $207,589.49 in attorney's fees and costs, an amount which plaintiffs contend was unreasonable. It is well settled that courts may inquire into the reasonableness of attorney's fees as part of their inherent authority. Smith v. State, Department of Transportation & Development, XXXX-XXXX (La. 3/11/05), 899 So. 2d 516, 527-528. Factors to be taken into consideration in determining reasonableness of attorney's fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. Smith, 899 So. 2d at 528. However, because we find no legal basis on this record for such an award, we pretermit review of the reasonableness of the award for attorney's fees and costs.